# NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Isabelle FRANKLIN, et al., on behalf of all other similarly situated employees in the State of California,<br><br>                                   Plaintiffs,<br><br>v.<br><br>HEALTHSOURCE GLOBAL STAFFING, INC., et al.,<br><br>                                   Defendants. | Case No.: 23-cv-0662-AGS-DEB<br><br>**ORDER:**<br><br>**(1) DENYING REMAND MOTION (ECF 10)**<br>**(2) GRANTING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION, STRIKE CLASS CLAIMS, AND DISMISS OR STAY ACTION (ECF 5)** |

The current motions in this putative employment class action raise two key issues. First, has the defense established the $5 million amount-in-controversy threshold for federal jurisdiction (thereby defeating plaintiffs' motion to remand to state court)? Second, do valid arbitration agreements cover all of plaintiffs' claims? The Court answers both questions in the affirmative. Thus, the remand motion is denied, and the case is dismissed in favor of arbitration.

## BACKGROUND

Plaintiffs Isabelle Franklin and Siera Haboc are nurses who worked for defendant HealthSource Global Staffing, Inc., as fill-in "[s]trikebreakers." (ECF 1-2, at 5–6.) Those seeking work through HealthSource use its secure online portal to nominate themselves for short-term assignments. (ECF 5, at 11–13.) After self-nomination, applicants are presented with various "pre-employment" documents, including the arbitration agreement at issue here. (*Id.* at 13.) Applicants need not sign this agreement to be considered for assignments. (*Id.*) If applicants do sign, HealthSource "does not request" that they sign it again for later assignments, "although they may do so." (*Id.* at 14.)

1

Plaintiff Franklin created an account on the HealthSource portal in 2010. (ECF 5, at 14.) On May 1, 2018, she logged in and electronically signed an arbitration agreement that covered all disputes arising from past and future employment relationships with HealthSource. (*Id.*) Franklin says she was "hired" in 2019. (ECF 1-2, at 6.) Per HealthSource, she worked a total of four assignments. (ECF 5, at 14.) By contrast, plaintiff Haboc created her HealthSource account on May 6, 2021, and she logged in and signed the arbitration agreement on August 9, 2021. (ECF 5, at 14.) Haboc worked only a single assignment later in 2021. (ECF 1-2, at 6.) In late 2022, both purport to have "resigned" from HealthSource by email. (*Id.*; *see* ECF 10-3, at 31.)

Soon thereafter, plaintiffs brought this putative class action against HealthSource in state court, alleging multiple wage-and-hour claims as well as unfair business practices. (ECF 1-2, at 9–10.) HealthSource removed the case here. (*See* ECF 1.)

## DISCUSSION

Plaintiffs move to remand the case to state court (ECF 10), while HealthSource seeks an order compelling arbitration, dismissing or alternatively staying the case, and striking the class claims (*see* ECF 5).

### MOTION TO REMAND

A matter is removable from state to federal court "if the federal court would have original subject matter jurisdiction over the action." *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1243 (9th Cir. 2009) (citing 28 U.S.C. § 1441). The Class Action Fairness Act "gives federal courts jurisdiction over certain class actions" if, among other things, "the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 84–85 (2014) (citing 28 U.S.C. § 1332(d)(2)). Defendants "need include only a plausible allegation" in their notice of removal that the jurisdictional threshold is met. *Id.* at 89. There is "no antiremoval presumption" in cases invoking CAFA jurisdiction. *Id.*

Plaintiffs seek remand on four separate theories: (1) removal was untimely (ECF 10-1, at 8, 26); (2) HealthSource is forum shopping (*id.* at 8, 28–29);

(3) HealthSource inflated the class size and thus the amount in controversy (*id.* at 14–15); and (4) HealthSource's assumptions are "baseless," "unreasonable," and "speculative" (*id.* at 16–26).

## A.   Timeliness of Removal

Certain circumstances trigger a 30-day deadline for a defendant to remove a putative class action to federal court. Plaintiffs contend that the complaint itself—which was filed and served in December 2022—started that 30-day clock here. By plaintiffs' calculations, then, the April 2023 removal was months late and thus invalid. (*See* ECF 1; ECF 10-1, at 9.) The defense believes the removal clock never started, so it was free to remove this case at its leisure.

There are two different potential 30-day removal deadlines. The first is triggered upon service of an initial pleading that "affirmatively reveals on its face the facts necessary for federal court jurisdiction." *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 691 (9th Cir. 2005); *see* 28 U.S.C. § 1446(b)(1). In the absence of such a clear-cut initial pleading, a second 30-day window may later arise if the defendant receives "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." *Id.* § 1446(b)(3). Both removal clocks are thus initiated by defendant's receipt of a document from the plaintiff or the state court—not by any action of defendant.

If neither of these "thirty-day deadlines" applies, the defense may remove a case "on the basis of its own information" at any time. *Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1125 (9th Cir. 2013). This "bright-line approach" avoids both "gamesmanship in pleading" and "collateral litigation over whether the pleadings contained a sufficient 'clue'" to removability. *Harris*, 425 F.3d at 697. Even if a defendant "*could have*" demonstrated removability earlier based on its knowledge beyond the pleadings, it is not "*obligated* to do so." *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1141 n.3 (9th Cir. 2013). Plaintiffs do not contend that the complaint or any "other paper"—on its face and without reference to HealthSource's own records—put

3

HealthSource on notice that the case was removable. That omission is dispositive on this issue.

Plaintiffs seek to circumvent the established course by distinguishing HealthSource's "*subjective* knowledge," into which they concede courts will not inquire, from its "*actual*" knowledge, which they claim can be "*objectively* establish[ed]." (ECF 10-1, at 26.) Specifically, plaintiffs point to two other lawsuits "within the past few years" in which HealthSource alleged "this same exact lack of initial ascertainability for this same group of putative class members." (*Id.*) But plaintiffs cite no authority for the proposition that the removal clock starts when a defendant can be shown—even conclusively—to have "known" that a case is removable based on its independent information. That is because this is not the rule.

True, defendants must apply "a reasonable amount of intelligence in ascertaining removability," which extends to "[m]ultiplying figures clearly stated in a complaint" to estimate potential class-wide damages. *Kuxhausen*, 707 F.3d at 1140. But this complaint provides no numerical estimations of class size, violation rates for any of its claims, or estimates of damages. Without reference to materials outside the complaint's four corners, HealthSource was unable to perform any calculations at all. And in such a situation, the law allows defendants to begin any investigation in their own time. *See Harris*, 425 F.3d 689, 694 (9th Cir. 2005) (noting that defendants have "no duty to make further inquiry" if the first removal window is not triggered); *Stiren v. Lowes Home Ctrs., LLC*, No. SA CV 19-00157 JLS (KESx), 2019 WL 1958511, at *3 (C.D. Cal. May 2, 2019) ("[D]efendants are not charged with *any* investigation, not even into their own records.").

Nor is there evidence here of the sorts of "gamesmanship" the Ninth Circuit noted might be problematic, like waiting to remove "until the state court has shown itself ill-disposed to defendant, or until the eve of trial . . . ." *Roth*, 720 F.3d at 1126. Plaintiffs filed the state-court complaint on December 6, 2022, and HealthSource removed the matter on April 12, 2023—apparently before any motion practice or hearings even took place. (ECF 10-1, at 10–11); *see Gutierrez v. Stericycle, Inc.*, No. LA CV15-08187 JAK (JEMx),

2017 WL 599412, at *3, *11–12 (C.D. Cal. Feb. 14, 2017) (finding removal timely even when defendant had "actively participated" in state-court litigation "for over a year"). Removal at this preliminary stage raises no concerns about these warned-of sharp practices. Plaintiffs' request for remand on this basis is denied.

**B.   Forum Shopping**

Plaintiffs insist they cannot conceive a reason—"outside of improper forum shopping"—that HealthSource "would first remove this case ***and then*** file a motion to compel arbitration." (ECF 10-1, at 8.) They intuit that HealthSource wanted "to avoid filing its motion to compel arbitration in state court," and sense something nefarious about that choice. (*Id.* at 29.) But they fail to articulate what that something might be.

Defendants need not give a reason for removing qualifying cases to federal court. Congress has "afford[ed] defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 133 (2005). "Although occasionally stigmatized as 'forum shopping,' the desire for a federal forum is assured by" federal law. *First State Ins. Co. v. Callon*, 113 F.3d 161, 162 (9th Cir. 1997). Plaintiffs offer only the unsupported conclusion that HealthSource "[n]o doubt" "believes it will receive a more favorable ruling" in federal court. (ECF 10-1, at 29.) Even if so, that is not grounds for the "sanctions for improper forum shopping" plaintiffs seek. (*Id.*); *see R2B2, LLC v. Truck Ins. Exch.*, No. C21-5585 BHS, 2021 WL 6049552, at *2 (W.D. Wash. Dec. 21, 2021) ("[Defendant] is no more guilty of forum shopping by removing than was [plaintiff] by filing in state court."). The forum-shopping accusations don't support remand, let alone the requested sanctions.

**C.   Class-Size Overstatement**

Next, plaintiffs object that HealthSource inflated the class size to meet the $5 million jurisdictional threshold. If defendant's amount-in-controversy allegation is disputed, the "parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015)

5

(quotation marks omitted). "[T]he burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy" requirement is satisfied. *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020). The assumptions underlying the defense's "theory of damages exposure" "cannot be pulled from thin air but need some reasonable ground underlying them." *Ibarra*, 775 F.3d at 1198–99.

In estimating the class size, HealthSource disregarded the arbitration-agreement qualification in the complaint's proposed class definition. The full proposed definition is: "All of Defendant's non-exempt employees [who] were assigned to work for any of its clients engaged in a labor dispute inside California during the Class Period *and [who] did not enter into valid and enforceable arbitration agreements . . . .*" (ECF 1-2, at 9 (emphasis added).) In other words, HealthSource based its calculations on the roughly "5,000 putative class members" who worked in California for "at least one day" during the class period, regardless of whether they signed an arbitration agreement. (ECF 1, at 5; ECF 20, at 12.) Plaintiffs protest that, as a result, "all of its calculations of potential damages are hugely inflated." (ECF 10-1, at 15.)

But the parties will likely disagree on which agreements are "valid and enforceable" for class-size purposes. (Indeed, plaintiffs are already doing so.) (*See* ECF 13.) And the defense need not predict which side will win that legal argument. For removal jurisdiction, HealthSource must forecast the amount "at stake"—that is, its damages exposure—not the amount it will urge to a factfinder. In this context, a court might find that *no* valid and enforceable arbitration agreements exist, "whatever the likelihood" of that outcome. *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018). The defense may allow for that possibility.

For damages-exposure purposes, plaintiffs dispute the validity of at least some arbitration agreements and seek to sweep within the class some employees who signed them. This key point distinguishes this case from the main authority plaintiffs rely on: *Cartwright v. Envoy Air, Inc.*, No. 2:21-cv-05049-RGK (PDx), 2021 WL 4100287 (C.D. Cal. Sept. 9, 2021). In *Cartwright*, the plaintiff had similarly excluded from his class

definition any employees subject to a "valid arbitration agreement." *Id*. at *3. In its class-size approximation, however, the removing defendant included "626 people who are covered by an arbitration agreement," on the theory that the "agreements are not valid" because the defense "has not yet sought to enforce" them. *Id.* at *3 (quotation marks omitted). The *Cartwright* court found that the "validity of those agreements" was not seriously in dispute, and thus the defense had "overstate[d] the class size." *Id*. Our facts are entirely different. Unlike *Cartwright*, the validity of the arbitration agreements is very much at issue here: plaintiffs signed arbitration agreements themselves, dispute the validity of those agreements, and seek potential class recovery on behalf of others who signed them. *See, e.g.*, *Francisco v. Emeritus Corp.*, No. CV 17-02871-BRO (SSx), 2017 WL 2541401, at *8 (C.D. Cal. June 12, 2017) (including in class-size estimate, for removal purposes, employees subject to arbitration agreements when "the scope and applicability of the arbitration agreement remain[ed] in question").

In sum, if plaintiffs' legal arguments are successful, their class will include many who signed arbitration agreements (albeit later deemed invalid). Thus, they cannot reasonably fault the defense for considering damages from these potential class members to be "at stake" in the litigation.

## D.   Amount-in-Controversy Assumptions

Finally, plaintiffs criticize HealthSource's damages assumptions regarding wages due for company-mandated transportation time as well as "waiting-time penalties" for willful failure to pay wages, among other claims.

### 1.   *Transportation-Time Wages*

HealthSource estimates that $842,592 is "at stake" for transportation-time wages. The complaint alleges that "Strikebreakers" are "required to use company-provided transportation to and from their assigned jobsites" because "crossing active, or potential picket lines without the protection of company-provided shuttles would seriously jeopardize the Strikebreakers' health and safety." (ECF 1-2, at 6.) HealthSource allegedly has "a pattern and practice of not paying these Strikebreakers for their transportation time,

7

and the associated wait time. . . ." (*Id.* at 6–7.) Under California law, the time that employees "are required to spend traveling on their employer's buses is compensable . . . ." *Morillion v. Royal Packing Co.*, 995 P.2d 139, 141 (Cal. 2000), *as modified* (May 10, 2000). This is so because the employees are "subject to the control of an employer" during both this "compulsory travel time" and the time spent waiting at a designated departure point. *Id.* at 142, 147; *cf. Overton v. Walt Disney Co.*, 38 Cal. Rptr. 3d 693, 699 (Ct. App. 2006) (finding time spent riding an optional shuttle non-compensable because "the key factor is whether Disney *required* its employees . . . to park there and take the shuttle"), *as modified* (Feb. 1, 2006). Both plaintiffs were required to wait for and use company transportation, but were not compensated "at all for said time." (*Id.* at 7.)

HealthSource reasonably interprets these claims as alleging two violations—one coming and one going—on every single workday for every class member. After all, plaintiffs aver that it was "compulsory" for employees to use a HealthSource shuttle to access their worksites, which consumed time they were not paid for "at all." (*Id.* at 6–7.) Because there are no allegations about how much time this took, HealthSource estimates a total of one hour of unpaid wages per *assignment*, rather than per shift, even though the average assignment comprises four shifts (ECF 1, at 9; ECF 20, at 10, 17). Because shifts were typically 12 hours long (ECF 1, at 6), HealthSource allocated half an hour to straight time and the other half-hour to overtime (*id.* at 9).[1] Class members earned an average of $94 per hour for straight time and $141 for overtime. (*Id.* at 6–7.) HealthSource estimates the total number of assignments as 7,171. (ECF 20, at 11.) Thus, it calculates that $337,037 is at stake for the straight-time portion ($94/hour x 0.5 hours x 7,171 assignments) and

---

[1] HealthSource should have calculated the entire uncompensated time at an overtime rate. Even if all travel occurred at the start of a given 12-hour shift, it would still have had the effect of depriving employees of that same amount of overtime later that day. Nevertheless, because this has no effect on the overall outcome, the Court accepts this understated estimate.

$505,555 for the overtime portion ($141/hour x 0.5 hours x 7,171 assignments), for a total of $842,592. (*Id.* at 18.)

The assumption of a one-hour violation per assignment also appears reasonable. Assignments typically last four days. (ECF 20, at 10.) On average, then, plaintiffs went uncompensated for waiting and transport time on eight occasions per assignment—at the start and finish of each of its four shifts. Dividing HealthSource's estimated 60 minutes by eight yields a modest average of 7.5 minutes per trip—which includes all necessary waiting, loading, and transport time. Unless every pick-up spot was located one block from each worksite and everyone involved was consistently punctual, it is difficult to imagine 7.5 minutes overstating the length of an average trip through "picket lines." (ECF 1-2, at 6.) Even if it does, any overstatement is harmless for purposes of determining whether the overall amount in controversy exceeds $5 million. The key characteristic of this claim is its universality and consistency. Even if each trip somehow took only one minute, the wages for those minutes remain unpaid, subjecting HealthSource to the possibility of enormous waiting-time penalties, as we shall shortly see.

Plaintiffs allege HealthSource had a "pattern and practice" of not paying for this time (ECF 1-2, at 6), and the plaintiffs both claim they have not been paid "at all" for it (*id.* at 7). Plaintiffs nevertheless decry what they perceive as HealthSource's use of a "100% violation rate," when their complaint alleges only a "pattern and practice" violation. (ECF 10-1, at 20.) True, "a 'pattern and practice' of doing something does not necessarily mean *always* doing something." *Ibarra*, 775 F.3d at 1198–99. But when a plaintiff alleges facts indicating that a defendant employer "universally, on each and every shift, violates labor laws," this can support finding a 100% violation rate. *Id.* at 1199. And here, plaintiffs allege that using the transportation was "required" and "compulsory," because HealthSource "does not reimburse" employees for the cost of renting cars to commute to work themselves. (ECF 1-2, at 6); *see Garcia v. Acushnet Co.*, No. 21-cv-01581-BEN-BGS, 2022 WL 1284820, at *5 (S.D. Cal. Apr. 29, 2022) (refusing to reduce violation rate based on "pattern and practice" pleading when circumstances indicated that violations

9

occurred on every shift). So, HealthSource's estimate of transportation-time damages are well-supported.

### 2. *Waiting-Time Penalties*

At any rate, the other damages calculations are dwarfed by the potential penalties for willfully unpaid wages, which HealthSource prices at over $21 million. Plaintiffs allege that they "and some members of the Class have separated from Defendant as a result of being discharged or having voluntarily resigned their employment." (ECF 1-2, at 18.) "If an employer willfully fails to pay" the wages of an employee who "is discharged or . . . quits," that employee's wages "continue as a penalty" for up to 30 days. Cal. Labor Code § 203(a). The "recovery of waiting time penalties does not hinge on the number of violations committed." *Demaria v. Big Lots Stores - PNS, LLC*, No. 2:23-cv-00296-DJC-CKD, 2023 WL 6390151, at *7 (E.D. Cal. Sept. 29, 2023). Because HealthSource "failed to pay all wages due," plaintiffs allege that they and the class are owed these statutory penalties. (ECF 1-2, at 18.)

HealthSource construed the complaint as potentially requesting waiting-time penalties for every single assignment worked, on the theory that workers were discharged from employment at the close of each one—or so a court could find. (*See* ECF 1, at 8; ECF 20, at 23.) It thus estimated the number of opportunities for the accrual of waiting-time penalties as being equal to the number of assignments over a three-year timeframe: 5,446. (*See* ECF 20, at 12 n.6.) And since at least some travel time remains unpaid for every assignment, each putative discharge at the end of each assignment could trigger a full 30 days' wages in waiting-time penalty. (*See* ECF 20, at 25.) Class members earned an average of $1,316 per day. (ECF 20, at 10–11.) Rather than credit the "100% violation rate" that plaintiffs "really allege," HealthSource opted for a conservative 10% estimate. (ECF 1, at 8.) Thus, it calculates the amount at stake for waiting-time penalties as at least $21,500,808 ($1,316/day x 30 days x 5,446 assignments x 10%). (ECF 20, at 25.)

Plaintiffs protest that "there was no plausible way for Defendant to interpret Plaintiffs' Complaint in a way that would assume that each of the . . . assignments triggered

waiting time penalties." (ECF 10-1, at 19.) Plaintiffs point out that, for a "temporary services employer," "the assumption that employment ends with each staffing assignment is contrary to California law." (*Id.* at 18.) For such employers, a discharge "can only occur when an employee is terminated from work with the temporary services employer, not when an employee's assignment with a client ends." (*Id.* (citing *Young v. RemX Specialty Staffing*, 308 Cal. Rptr. 3d 320, 324 (Ct. App. 2023)).)

But the complaint does not allege that HealthSource is a "temporary services employer" (nor, for that matter, does it ever use the word "temporary"). It describes HealthSource instead as "an employment staffing agency" that, among other things, "provides replacement labor staffing for employers involved in labor disputes in California." (ECF 1-2, at 5.) While plaintiffs are indeed not obliged to lay out every legal contour of their arguments in an initial pleading, a defendant has only those contours to work with when assessing the amount in controversy. The Court certainly does not have sufficient evidence before it to determine as a matter of law that HealthSource qualifies as a temporary services employer under that statute, even if doing so were appropriate at this stage.

In previous suits brought by other employees against HealthSource, courts have found the jurisdictional threshold met and have denied remand on just this basis: the potential for multiple waiting-time-penalty recoveries. *See Louis v. HealthSource Glob. Staffing, Inc.*, No. 22-CV-02436-JD, 2022 WL 4866543, at *2 (N.D. Cal. Oct. 3, 2022) (finding it "reasonable for Health[S]ource to construe plaintiffs' theory of recovery as 'a claim that each assignment worked represents a separate employment, requiring the payment of final wages'"); *Marron v. HealthSource Glob. Staffing, Inc.*, No. 19-CV-01534-KAW, 2019 WL 4384287, at *6 n.4 (N.D. Cal. Sept. 13, 2019) ("Plaintiff's complaint can be fairly read as alleging that each new assignment represented a separate employment, requiring the payment of final wages thereafter."); *Mackall v. HealthSource Glob. Staffing, Inc.*, No. 16-CV-03810-WHO, 2016 WL 4579099, at *2 (N.D. Cal. Sept. 2, 2016) (agreeing with HealthSource that the "number of terminations" eligible for waiting-

time penalties should equal the number of completed assignments, "rather than the number of class members").

What plaintiffs have tried to do differently in this case is to plead that they "resigned" their employment on dates long after their final assignments. (ECF 1-2, at 6.) This might indeed be consistent with the position that their waiting-time claims are based only on a single separation date, and that each class member is limited to at most a single waiting-time penalty. But that is not the only possible interpretation. By leaving ambiguous their position on whether HealthSource is a "temporary services employer," plaintiffs are not foreclosed from later contending that it isn't one. For instance, they could readily argue that those resignation emails merely represented withdrawal from consideration for future, stand-alone employment engagements. This is at least within the realm of possibility, which is what counts for purposes of determining the amount "at stake" in the litigation. *See Chavez*, 888 F.3d at 417 (explaining that a potential recovery on a claim places that amount "at stake," "whatever the likelihood" that it will be realized).

Plaintiffs also quibble with HealthSource's decision to "arbitrarily assume[] a 10% violation rate" for waiting-time penalties. But as stated above, the Court views this choice as conservative. If travel time went uncompensated for every shift, as plaintiffs allege, then assuming a 100% violation rate per assignment would be appropriate—and would increase HealthSource's already sizeable damages estimate tenfold. *See Marron*, 2019 WL 4384287, at *6 (noting that "it would be reasonable to even assume a 100% violation rate, rather than the 10% violation rate that Defendant relies upon" for waiting time penalties, due to allegedly universal travel-time violations); *Garcia*, 2022 WL 1284820, at *5 (accepting 100% violation rate for all claims, including waiting-time penalties, when they all depended on "core allegations" of unpaid travel time to and from break area). In any event, almost any violation rate would push the suit well above the jurisdictional floor. *See Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 996 (9th Cir. 2022) (rejecting a "'focus on the trees, not the forest' approach" that, if pursued, "would result in remanding cases where the real amount in controversy is clearly over the $5 million threshold").

12

Because the Court finds the jurisdictional threshold met on the waiting-time claims alone, it need not address defendant's other arguments relating to the amount in controversy. *See Burgos v. Citibank, N.A.*, No. 23-CV-01907-AMO, 2023 WL 5532123, at *5 (N.D. Cal. Aug. 28, 2023) (ending analysis when "proposed valuations" of claims already examined "well exceed[ed] CAFA's $5 million floor"); *Alvarez v. Office Depot, Inc.*, No. CV 17-7220 PSG (AFMx), 2017 WL 5952181, at *4 (C.D. Cal. Nov. 30, 2017) (same).

Accordingly, plaintiffs' remand motion is denied.

## MOTION TO COMPEL ARBITRATION[2]

The Federal Arbitration Act "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The district court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat'l Assn.*, 673 F.3d 947, 955 (9th Cir. 2012), *on reh'g en banc*, 718 F.3d 1052 (9th Cir. 2013). In making these determinations, "district courts rely on the summary judgment standard of Rule 56," since an "order compelling arbitration is in effect a summary disposition" of the matter. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quotation marks omitted). The proponent of arbitration must prove "the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). If it succeeds, "the opposing party must prove any contrary facts by the same burden." *Franz v. Hyundai Motor Am.*, No. 8:23-CV-01640-NS-ADS, 2024 WL 176227, at *4 (C.D. Cal. Jan. 12, 2024).

---

[2] As a preliminary matter, plaintiffs' opposition to this motion was filed four calendar days late. The Court will nonetheless consider plaintiffs' response, as it does not change the result. Whether the Court grants HealthSource's motion on its merits or because it was unopposed, the motion is granted all the same.

HealthSource has carried its burden to prove the existence of a valid agreement to arbitrate, and that it encompasses the disputes at issue. HealthSource produced two undisputed arbitration agreements electronically signed by Franklin and Haboc on May 1, 2018, and August 9, 2021, respectively. (ECF 6, at 8–10, 12–14.) The agreements provide that "any and all disputes arising out of . . . [plaintiffs'] employment with HealthSource, and any and all previous and future employment relationships with HealthSource, . . . shall be submitted to binding arbitration before a neutral arbitrator." (ECF 6, at 8, 12.) The agreements also forbid both HealthSource and plaintiffs from "assert[ing] class action or representative action claims against the other in arbitration or otherwise . . . ." (*Id.*) They provide that the parties "shall only submit their own, individual claims in arbitration and will not seek to represent the interests of any other person." (*Id.*)

The foregoing language covers all 11 claims, since all are grounded in plaintiffs' employment relationship(s) with HealthSource. *See Sheppard v. Staffmark Inv., LLC*, No. 20-CV-05443-BLF, 2021 WL 690260, at *2–4 (N.D. Cal. Feb. 23, 2021) (compelling arbitration upon finding that meal-period, rest-break, accurate-wage-statement, wages-at-separation, and UCL claims arose out of the "employment relationship"); *Shams v. Revature LLC*, 621 F. Supp. 3d 1054, 1058 (N.D. Cal. 2022) (failure to reimburse business-related expenses); *Bill-Flores v. Dolgen California LLC*, No. SACV 16-02286 JVS (DFMx), 2017 WL 11634775, at *7 (C.D. Cal. Mar. 29, 2017) (unpaid overtime and waiting-time penalties). Plaintiffs do not dispute this characterization of their claims.

Plaintiffs resist arbitration on five different grounds. None of their challenges gives rise to a genuine dispute of material fact as to whether the arbitration agreements are valid and binding.

## A.  Multiple Arbitration Agreements

Plaintiffs argue that HealthSource has not shown that the arbitration agreement it produced "was the operative agreement in place at the time the causes of action arose" here. (ECF 13, at 17.) They claim that HealthSource itself contends in its motion that workers sign more than one arbitration agreement over the course of their employment

14

relationship. (ECF 13, at 7 (citing ECF 5, at 12–13).) But that motion actually states that, once the arbitration agreement is signed, HealthSource "does not request" the applicant to sign another one "when working later assignments, although they may do so." (ECF 5, at 14.) Plaintiffs also make much of HealthSource's statement that it has no "record of any attempt by [plaintiffs] to revoke the Arbitration Agreement, *or any arbitration agreement*, [they] signed." (ECF 13, at 7; *see* ECF 5, at 14.) Plaintiffs strain to construe this as an affirmative admission that multiple arbitration agreements exist. But that is not a reasonable reading. This statement merely means that, to the extent plaintiffs may assert the existence of other agreements, HealthSource has no record of their attempting to revoke those either. In fact, HealthSource avers that plaintiffs' employment records "show neither of them ever agreed to any other arbitration agreement." (ECF 15, at 12.)

Plaintiffs press new evidence into their argument that other arbitration agreements must be in play. First, Akimasia Walker, apparently a current HealthSource employee, declares that she requested her "employment records" before this lawsuit commenced. (ECF 13-5, at 2.) In the employment file she received was a document titled "Temporary Employment Agreement," electronically signed by her. (*Id.*) While that contract does contain an arbitration clause, it also contains carve-out language: "this Agreement has no effect on and does not supersede any arbitration agreement between [Walker] and HealthSource." (*Id.* at 10.) So, even if plaintiffs also signed this document—and there is no evidence that they did—it would not affect the enforceability of the operative arbitration agreement.

Second, plaintiff Haboc, visiting her HealthSource portal on an unspecified date, says she "was able to view" a different arbitration agreement of unknown provenance. (ECF 13-4, at 2.) She was able to take a screenshot of only the top of the agreement— though it is unclear why she could not have scrolled down to capture the rest of the document. (*See id.* at 7.) Even setting aside authentication issues, it is impossible to tell whether this agreement also contained carve-out language, since only its top portion is allegedly reproduced. In any event, Haboc says she "did not sign" the agreement. (*Id.* at 2.)

23-cv-0662-AGS-DEB

Based on this additional evidence, plaintiffs deduce that they must have signed multiple arbitration agreements "with conflicting arbitration provisions" over the course of their time with HealthSource. (ECF 13, at 8.) And HealthSource must have "cherry-pick[ed] from its assortment of arbitration agreements" to argue now that plaintiffs "are bound by whatever contract it has selected as most favorable." (*Id.*) Yet Walker is not a named plaintiff, and Haboc is emphatic that she "did not sign" the agreement she partially captured on her phone. (ECF 13-4, at 2.) Plus, both plaintiffs claim they "do not recall" signing any arbitration agreement at all. (ECF 13-3, at 2; ECF 13-4, at 2.)

Put simply, plaintiffs argue that the hypothetical existence of other agreements—which plaintiffs probably did not sign, and which may have had carve-out language—should defeat HealthSource's attempt to enforce an arbitration agreement plaintiffs *did* sign, and which covered all past and future work assignments. The Court declines to take such a broad inferential leap. As a result, the Court need not address plaintiffs' "lack of mutual assent" argument, which is premised on the hypothetical existence of these multiple, signed, conflicting arbitration agreements. (*See* ECF 13, at 18–19.)

## B.   Limited Agreements

Plaintiffs conclude that the arbitration agreements cannot apply to all their assignments, and therefore cannot cover the entire dispute, because they read them as being limited in scope to a single assignment. (ECF 13, at 17.) This is so, they claim, because the phrase "for this assignment" appears three times in the agreement, so it is "clear it is assignment-specific"—and therefore HealthSource has not shown that it applies to all the disputes in controversy here. (ECF 13, at 12–13.) But as plaintiffs point out, the agreement also states that it covers "all previous and future employment relationships with HealthSource . . . ." (*Id.* at 13.) Although they acknowledge that this presents a "direct conflict" with their preferred interpretation, plaintiffs resolve it by assuming the agreement is an assignment-specific document with (presumably) an errantly inserted term—one that is best ignored, since it clashes irreconcilably with their reading. (*Id.*)

16

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. The three references to "for this assignment" appear in paragraphs 1, 4, and 5 of the agreements. (*See* ECF 6, at 8–9, 12–13.) Giving effect to the clause in paragraph 2 specifying that the agreement embraces "all previous and future employment relationships," the three "assignment-specific" clauses can readily be harmonized with the contract as a whole.

Plaintiffs acknowledge that it is HealthSource's business to "place health professionals at hospitals across the United States," exposing it to legal action nationwide. (ECF 13, at 13.) An arbitration agreement of universal applicability would naturally be expected to specify that disputes are to be resolved under the law and in the forum applicable to their corresponding assignment. In this context, then, the three clauses are most reasonably read as specifying the applicable jurisdiction, choice of law, or interim-equitable-relief venue for any given dispute, based on where "the majority of work was performed" for the assignment during which a dispute arose. (ECF 6, at 8–9; *id.* at 12–13.) This is the most reasonable interpretation that gives effect to the agreement's every part.

Alternatively, it is possible to construe paragraphs 1, 4, and 5 as specifying the jurisdiction, choice of law, and venue for a single assignment. But even if such a reading were accepted, it would not alter the terms of paragraph 2, which bind the parties to arbitrating disputes arising from "all previous and future relationships"—regardless of any assignment-specific provisions that may appear in other clauses. (*See* ECF 6, at 8, 12.)

In other words, while the clauses' phrasing may not be a model of clarity, it is clear enough—in the context of the contract as a whole—that the agreement was meant to cover all the claims now at issue. To the extent clauses may be read to conflict, "it is the duty of the court to reconcile the conflicting clauses so as to give effect to the whole of the instrument, if that is possible within the framework of the general intent or predominant purpose of the instrument." *In re Marriage of Williams*, 105 Cal. Rptr. 406, 412 (Ct. App. 1972); *see also* Cal. Civ. Code § 1652.

17

1   Plaintiffs' protest that "it was never their understanding that any of the
2   pre-employment documents would extend beyond any single assignment." (ECF 13, at 18.)
3   But their subjective understanding is irrelevant. "When a contract is reduced to writing, the
4   intention of the parties is to be ascertained from the writing alone, if possible . . . ."
5   Cal. Civ. Code § 1639. It is possible here. For Haboc, who only ever worked one
6   assignment anyway, the issue is immaterial. For Franklin, the agreement she signed states
7   that it covers all past and future assignments. "Reasonable diligence requires the reading
8   of a contract before signing it. A party cannot use his own lack of diligence to avoid an
9   arbitration agreement." *Rowland v. PaineWebber Inc.*, 6 Cal. Rptr. 2d 20, 24 (Ct. App.
10  1992).

11   Even if the Court were inclined to look beyond the agreement itself, the evidence is
12  at best mixed for plaintiffs. Near the time each plaintiff signed, they "completed a number
13  of other items that applied generally to their HSG accounts which were not 'assignment-
14  specific,'" casting further doubt on their purported expectations about the agreements'
15  duration. (ECF 15, at 12.) At any rate, the Court rejects plaintiffs' narrow reading of the
16  arbitration agreements.

17  **C.   Unconscionability**

18   Next, plaintiffs seek to void the arbitration agreement as unconscionable. In
19  California, unconscionability "has both a 'procedural' and a 'substantive' element, the
20  former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter
21  on 'overly harsh' or 'one-sided' results." *Armendariz v. Foundation Health Psychcare*
22  *Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000) (cleaned up). While both elements must be present
23  to find unconscionability, "they need not be present in the same degree." *Id.* "[T]he party
24  opposing arbitration bears the burden of proving any defense, such as unconscionability."
25  *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1224–25
26  (Cal. 2012).

27
28

18

### 1. *Procedural Unconscionability*

"The threshold inquiry in California's unconscionability analysis is whether the arbitration agreement is adhesive." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (cleaned up). "[A]n arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1206, 1211 (9th Cir. 2016) (finding no unconscionability in part because "there [was] an opportunity to opt out of" the arbitration agreement "within 30 days"). The agreement plaintiffs signed here was not adhesive, because it had a conspicuous opt-out provision. (*See* ECF 6, at 9 ("You understand that you have thirty (30) days after you sign this agreement to revoke it and, if you do so, neither HealthSource nor you will be bound by the terms of this agreement." (capitalization omitted)).) Thus, plaintiffs cannot show procedural unconscionability.

Plaintiffs make a few other arguments, but each misses the mark. They claim that Healthsource "routinely presented employees with other arbitration agreements that did not contain opt-out provisions." (ECF 13, at 23–24.) But, for the same reasons set out above, plaintiffs have not adduced sufficient evidence to support this claim. *See supra* section II.A. There is no evidence that either plaintiff signed another arbitration agreement or, even if they did, that it would supersede the ones they did sign.

Their next argument fares no better. Plaintiffs claim HealthSource would "sometimes" provide paperwork "on arrival to an assignment" that "applied to that specific assignment only." (ECF 13, at 9–10.) From that fact, and from some of the other paragraphs in the arbitration agreement, they conjure a post hoc "understanding that any pre-employment documents were assignment-specific." (ECF 13, at 23–24.) But the voluntarily signed arbitration agreements state that they apply to "any and all previous and future employment relationships with HealthSource," from which no reasonable reader could infer impermanence. (ECF 6, at 8, 12.) And the arbitration agreement was not presented to plaintiffs in a rush upon their arrival at an assignment; there is no question they had a meaningful opportunity to read and understand it before signing. It was available

19

on HealthSource's online portal for workers to read, ponder, and sign (or not) at their leisure. (*See* ECF 5, at 13.)

Lastly, plaintiffs caution that "the employment context" presents special issues with procedural unconscionability to which courts must be attuned. (ECF 13, at 23.) True, the "economic pressure exerted by employers . . . may be particularly acute . . . ." *Armendariz*, 6 P.3d at 690. But such issues are of little concern here. After all, signing the agreement is not even a requirement "for the applicant to be considered for assignment." (ECF 5, at 13.) And for those who do sign, the agreements state that choosing to later "opt out" will not adversely affect their terms and conditions of employment. (ECF 6, at 10, 14.) These circumstances do not herald the "high levels of both oppression and surprise" that plaintiffs exhort. (ECF 13, at 24.)

If there is any evidence of procedural unconscionability, it appears minimal. Nevertheless, because HealthSource both drafted the agreement and likely possessed superior bargaining power, the Court will continue the analysis and assess substantive unconscionability. *See Nagrampa*, 469 F.3d at 1284 (explaining that, even when "evidence of procedural unconscionability appears minimal," courts are required "under California law" to consider substantive unconscionability as well).

## 2. *Substantive Unconscionability*

A finding of substantive unconscionability "requires a substantial degree of unfairness beyond a simple old-fashioned bad bargain. . . . Not all one-sided contract provisions are unconscionable; hence the various intensifiers in our formulations: '*overly* harsh,' '*unduly* oppressive,' '*unreasonably* favorable.'" *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 12 (Cal. 2016) (cleaned up) (finding arbitration agreement was not unconscionable when it imposed identical obligations on employer and employee). Plaintiffs raise two main arguments regarding substantive unconscionability. First, they point out that the arbitration agreement contains a class-action waiver, which they claim subjects employees to "immeasurable" detriment. (ECF 13, at 21.) If enforced, employees "might not be able to find legal counsel" to pursue their "meritorious, but costly (in time

20

and money) claims." (*Id.*) Be that as it may, this Court is bound to "enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("Requiring the availability of classwide arbitration . . . creates a scheme inconsistent with the [Federal Arbitration Act]."); *Carter v. Rent-A-Center, Inc.*, 718 F. App'x 502, 504 (9th Cir. 2017) (explaining that *Concepcion* "foreclos[es] any argument" that "an arbitration agreement is unconscionable solely because it contains a class action waiver").

Second, plaintiffs contend that the agreements are improperly "one-sided," relying on *Navas v. Fresh Venture Foods, LLC*, 301 Cal. Rptr. 3d 423 (Ct. App. 2022). (*See* ECF 13, at 21–22.) The *Navas* court found substantively unconscionable an arbitration agreement that listed nine example "covered claims," each of a type "that *only* employees bring against employers." 301 Cal. Rptr. 3d at 432. Although the agreement was "valid for all legal claims," the inclusion of the nine examples indicated that it was "primarily one-sided in favor of" the employer. *Id.* By contrast, plaintiffs acknowledge that the agreements here do not detail any specific "types of claims," one-sided or otherwise. (*See* ECF 13, at 22.) Moreover, *Navas* appears out of step with its controlling precedent. *See Baltazar*, 367 P.3d at 14 (reasoning that if "all employment-related claims" are covered, an "illustrative list of claims subject to the agreement is just that").

In sum, plaintiffs' arguments are unavailing. The Court discerns no "substantial degree of unfairness" in this arbitration agreement that might raise concerns about substantive unconscionability.

## D.   Lack of Consideration

Plaintiffs reckon that a mutual promise to arbitrate cannot constitute consideration, "as mutuality is already legally required." (ECF 13, at 20.) For this proposition, they cite the voluminous *Armendariz* decision in its entirety. Perhaps they meant to reference that case's unconscionability analysis, which makes the unremarkable point that a contract "lacking in mutual consideration" is illusory. *Armendariz*, 6 P.3d at 692. Plaintiffs are

21

correct that a valid contract requires mutuality *of consideration*. But "any prejudice suffered, or agreed to be suffered, by [a promisee], other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." Cal. Civ. Code § 1605. So, the parties' mutual "promise to be bound by the arbitration process itself serves as adequate consideration." *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002); *see also Garner v. Inter-State Oil Co.*, 265 Cal. Rptr. 3d 384, 389 (Ct. App. 2020) (rejecting "lack of consideration" argument when "mutual, obligating promises to arbitrate" had been made "in the formation of the contract").

## E.   Waiver of Arbitration Rights

Plaintiffs also contend that HealthSource waived its right to arbitration "by removing the case to this Court based on its belief that this Court has original jurisdiction," because the removal was "coupled with participation in several months of litigation . . . ." (ECF 13, at 16.) To their mind, this amounts to a "presumptive waiver of the right to arbitrate." (*Id.*) The proponent of waiver must show "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *United States v. Park Place Assocs.*, 563 F.3d 907, 921 (9th Cir. 2009) (quotation marks omitted). Plaintiffs have failed to make a showing of (at least) the second element.

To assess whether a party acted inconsistently with its arbitration right, courts take "a holistic approach" and consider "the totality of the party's actions." *Sequoia Benefits & Ins. Servs., LLC v. Costantini*, 553 F. Supp. 3d 752, 758 (N.D. Cal. 2021). A party's "extended silence and delay in moving for arbitration" could indicate a desire for a judicial ruling on the merits, "which would be inconsistent with a right to arbitrate." *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016). Such a delay, paired with "actively litigating" the claim, can satisfy this element. *Id.* at 1126 (finding waiver after party litigated for "seventeen months," "conduct[ed] a deposition," and filed a "motion to dismiss"); *see also Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988) (finding

waiver when party "actively" litigated, filed "pleadings [and] motions," "and did not move to compel arbitration until more than two years" after suit commenced); *Kelly v. Public Util. Dist. No. 2*, 552 F. App'x 663, 664 (9th Cir. 2014) (finding waiver when party "conducted discovery and litigated motions, including a preliminary injunction and a motion to dismiss" for "eleven months"). But "numerous courts have held that merely removing a case to federal court, where the defendant has not engaged in protracted litigation or obtained discovery, does not give rise to waiver of the right to arbitrate . . . ." *DeMartini v. Johns*, No. 3:12-CV-03929-JCS, 2012 WL 4808448, at *5 (N.D. Cal. Oct. 9, 2012).

HealthSource's actions indicate a desire for arbitration and little appetite for litigation. After this case was brought in state court, HealthSource filed an answer that specified "Arbitration Agreement" as its first defense. (*See* ECF 2, at 2; ECF 13, at 10–11.) Later that month, HealthSource emailed the arbitration agreements to plaintiffs and asked them to stipulate to arbitration, which they refused. (ECF 13, at 11.) The next month, HealthSource objected to plaintiffs' written discovery "on the grounds that 'the discovery is unauthorized because Plaintiffs' claims are subject to individual arbitration . . . .'" (*Id.*) It also resisted plaintiffs' other contemporaneous attempts to engage it in discovery. (*Id.* at 11–12.) A couple months later, HealthSource removed to federal court and promptly moved to compel arbitration. (*Id.* at 12.) HealthSource has filed no other motions, and there is no evidence that it ever sought discovery.

In short, HealthSource asserted its arbitration rights at nearly every turn. Its unwavering pursuit of arbitration places it in a different category from the arbitration-waiving defendants in the cases plaintiffs rely upon. *See Hoover v. American Income Life Ins.*, 142 Cal. Rptr. 3d 312, 316–18 (Ct. App. 2012) (affirming waiver of arbitration rights due to defendant's "15-month delay in petitioning for arbitration" and "active litigation, including . . . [a] demurrer, an unsuccessful mediation, discovery disputes," and the defense's propounding "special interrogatories and document requests" and noticing a "deposition"); *Adolph v. Coastal Auto Sales, Inc.*, 110 Cal. Rptr. 3d 104, 110–11 (Ct. App.

23

2010) (affirming arbitration waiver based on the defense's "6 months of delay" before seeking to compel arbitration and because it "filed two demurrers, accepted and contested discovery request[s], engaged in efforts to schedule discovery, [and] omitted to mark or assert arbitration in its case management statement"). Unlike those defendants, HealthSource has preserved its right to arbitration.

Because HealthSource has met its burden of showing a valid and binding arbitration agreement governs this case, and plaintiffs have not proven the contrary, the motion to compel arbitration is granted.

### MOTION TO DISMISS OR STAY

HealthSource also moves to dismiss or to stay this matter pending arbitration. (ECF 5, at 23.) When a court is satisfied that a claim should be referred to arbitration, it "shall on application of one of the parties" stay the action "until such arbitration has been had in accordance with the terms of the [arbitration] agreement." 9 U.S.C. § 3. The Ninth Circuit has interpreted this statute to offer flexibility: "a district court may either stay the action or dismiss it outright when . . . the court determines that all of the claims raised in the action are subject to arbitration." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014). Because all claims here are to be arbitrated, the Court dismisses this action without prejudice.

### **CONCLUSION**

The Court orders as follows:

1. Plaintiffs' remand motion is **DENIED**.

2. HealthSource's motions to compel arbitration and dismiss are **GRANTED**. The individual claims in the complaint are referred to arbitration, and the case is **DISMISSED** without prejudice.

3. HealthSource's motions to strike class claims and stay the action are **DENIED AS MOOT**.

23-cv-0662-AGS-DEB

4.  HealthSource's motion for judicial notice of a California trial-court order is **GRANTED**. (*See* ECF 8.)

5.  The Clerk is directed to close this case.

Dated:  March 11, 2024

 

Andrew G. Schopler
United States District Judge